UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALVIN ABALOS, | ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) ) | **COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934** |
| VIVINT SOLAR, INC., DAVID BYWATER, ELLEN S. SMITH, PETER F. WALLACE, TODD R. PEDERSEN, JOSEPH S. TIBBETTS, JR., DAVID D'ALESSANDRO, BRUCE MCEVOY, JAY D. PAULEY, VIKING MERGER SUB, INC., and SUNRUN INC., | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

Plaintiff Alvin Abalos ("Plaintiff"), alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1. Plaintiff brings this action against Vivint Solar, Inc. ("Vivint Solar" or the "Company") and Vivint Solar's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15.U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, arising out of the Board's attempt to sell the Company to Sunrun Inc. through its wholly-owned subsidiary, Viking Merger Sub, Inc. (together, "Sunrun").

2. Defendants have violated the above-referenced sections of the Exchange Act by causing a materially incomplete and misleading registration statement (the "S-4") to be filed with the United States Securities and Exchange Commission ("SEC") on August 14, 2020. The S-4 recommends that Vivint Solar stockholders vote in favor of a proposed transaction (the "Proposed

1

Transaction") whereby Vivint Solar is acquired by Sunrun. The Proposed Transaction was first disclosed on July 6, 2020, when Vivint Solar and Sunrun announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Vivint Solar stockholders will receive 0.55 shares of Sunrun common stock for each share of Vivint Solar that they hold (the "Merger Consideration"). The deal is valued at approximately $3.2 billion and is expected to close in the fourth quarter of 2020.

3. An affiliate of The Blackstone Group Inc. ("Blackstone") owns a majority of the Company's shares. Blackstone has invested in renewable energies, including solar energy companies like Vivint Solar. But over time the cost of solar energy has dropped, making it much cheaper for consumers. Vivint Solar has not fared well, posting losses for years. But after a botched merger attempt, a sale of Blackstone's shares caused Vivint Solar's share price to tumble. While the Proposed Transaction was the culmination of a long sales process, that process was riddled with conflict.

4. The S-4 is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the S-4 contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Vivint Solar management, as well as the financial analyses conducted by Morgan Stanley & Co. LLC ("Morgan Stanley") and BofA Securities, Inc. ("BofA"), Vivint Solar's financial advisors.

5. For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin defendants from taking any steps to consummate the Proposed Transaction, including filing an amendment to the S-4 with the SEC or otherwise causing an amendment to the S-4 to be disseminated to Vivint Solar's stockholders, unless and until the material information discussed

below is included in any such amendment or otherwise disseminated to Vivint Solar's stockholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the defendants' violations.

## PARTIES

6. Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Vivint Solar.

7. Defendant Vivint Solar is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 1800 West Ashton Blvd., Lehi, Utah 84043. Vivint Solar's common stock trades on NYSE under the ticker symbol "VSLR."

8. Defendant David Bywater ("Bywater") has been Chief Executive Officer ("CEO") since December 2016 and a director of the Company since 2017.

9. Defendant Ellen S. Smith ("Smith") has been a director of the Company since March 2020.

10. Defendant Peter F. Wallace ("Wallace") has been a director of the Company since 2012 and Chairman of the Board since 2014. Defendant Wallace is a senior managing director at Blackstone, which holds a majority of the Company's common stock and voting power. Defendant Wallace serves on the board of directors of Vivint Smart Home, in which Blackstone holds more than 60%, and previously served as a director of SeaWorld Entertainment, Inc., in which Blackstone was a significant investor.

11. Defendant Todd R. Pedersen ("Pedersen") has been a director of the Company since 2012. Defendant Pedersen is a co-founder of Vivint Solar and was Vivint Solar's CEO from

August 2011 through January 2013. Defendant Pedersen is the CEO and a director of Vivint Smart Home, in which Blackstone holds more than 60%, and is a director of APX Group Holdings, Inc., which is a subsidiary of Vivint Smart Home.

12. Defendant Joseph S. Tibbetts, Jr. ("Tibbetts") has been a director of the Company since 2014.

13. Defendant David D'Alessandro ("D'Alessandro") has been a director of the Company since 2013. Defendant D'Alessandro is Chairman of the Board of Vivint Smart Home, in which Blackstone holds more than 60%. Defendant D'Alessandro also serves as a director of APX Group Holdings, Inc., which is a subsidiary of Vivint Smart Home, and was a director of SeaWorld Entertainment, Inc. from 2010 to 2017, in which Blackstone was a significant investor.

14. Defendant Bruce McEvoy ("McEvoy") has been a director of the Company since 2012. Defendant McEvoy is a senior managing director at Blackstone, which holds a majority of the Company's common stock and voting power. Defendant McEvoy also serves as a director of Vivint Smart Home, in which Blackstone holds more than 60%, and was a director of SeaWorld Entertainment, Inc.

15. Defendant Jay D. Pauley ("Pauley") has been a director of the Company since 2015. Defendant Pauley also serves as a director of Vivint Smart Home, in which Blackstone holds more than 60%, and APX Group Holdings, Inc., which is a subsidiary of Vivint Smart Home.

16. Defendants Bywater, Smith, Wallace, Pedersen, Tibbetts, D'Alessandro, McEvoy and Pauley are collectively referred to herein as the "Board" or "Individual Defendants."

17. Defendant Sunrun Inc. is a Delaware corporation. Sunrun's principal executive offices are located at 225 Bush Street, Suite 1400, San Francisco, California 94104. Sunrun Inc. common stock trades on Nasdaq under the ticker symbol "RUN."

18. Defendant Viking Merger Sub, Inc. is a Delaware corporation and is a wholly-owned subsidiary of Sunrun Inc.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

20. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

21. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) a significant amount of the conduct at issue took place and had an effect in this District; and (ii) Vivint Solar is incorporated in this District.

## SUBSTANTIVE ALLEGATIONS

**A. Blackstone Steered an Unfair Process Tainted by Conflict**

22. Vivint Solar was incorporated in 2011. The Company installs solar energy systems at residential locations and provides solar energy to those locations mainly through long-term contracts. Residential customers can install a solar energy system for little to no money and pay Vivint Solar for the solar energy generated by the system. From 2011 through the end of 2019, Vivint Solar installed 1,294 megawatts of solar energy capacity at 188,300 homes. In 2019, 63.7% of the Company's revenues were generated from the long-term contracts with customers.

23. In November 2012, Blackstone acquired 100% of the equity interests of Vivint Solar. When Vivint Solar went public in the fall of 2014, Blackstone sold approximately 22% of

its shares.  Blackstone's ownership fell to 59.6% as of April 16, 2020.

24. Blackstone has made significant investments in the alternative energy sector. Blackstone created Onyx Renewable Partners in 2014, a company that invests in and helps develop utility scale renewable energy projects across the United States.  That same year, Blackstone formed Altus Power America, Inc. with Altus Power Management, LLC to fund solar energy projects.  In 2018, Blackstone created a company to develop, finance and operate primarily renewable energy projects in the Middle East and North Africa.  In January 2020, Blackstone invested another $850 million in Altus Power America, Inc., which installs clean energy systems on commercial and municipal sites.  Just two months later, Blackstone announced it had acquired a company that builds battery storage for renewable energy.

25. Blackstone's interest in solar energy was not limited to investing in energy-producing companies.  In November 2017, Blackstone announced that it would work with Onyx Renewable Partners to install solar energy systems on the rooftops of the buildings in Stuyvesant Town and Peter Cooper Village, a multi-family residential project in New York City.  Blackstone is a part owner of the residential project.  The solar energy systems installed would cost $10 million and cover 56 buildings.  According to the Wall Street Journal, Blackstone "has been aggressive in efforts to find energy cost savings" in its investments, and had generated almost $100 million in value from its efforts by the end of 2017.[1]  The Stuyvesant Town solar energy system made money for Blackstone, because solar energy is now the cheapest form of energy in the United States.  One aspect of solar energy's affordability is the cost of solar panels.  While solar panels cost around $1,000 per panel in the mid-2000s, now solar panels cost $150 per panel.

---

[1] Peter Grant, "Stuytown Owners Make Solar-Panel Investment," The Wall Street Journal, Nov. 7, 2017, *available at* https://www.wsj.com/articles/stuytown-owners-make-solar-panel-investment-1510098039.

26.     The 90% decrease in the cost of solar energy means that installing solar energy systems can create cost savings for businesses and industries. Blackstone itself has seen a return on investment from the solar energy system installed at the Stuyvesant Town and Peter Cooper Village residential project. Yet Vivint Solar has not fared well. The Company has recorded a net loss every year since 2013, except for 2017, and the Company's net loss increased more than 51% from $279.5 million in 2018 to $423.3 million in 2019.

27.     As Vivint Solar's majority stockholder, Blackstone was well aware of Vivint Solar's financial situation. And Blackstone wanted to exit from its investment in the Company. However, a sale of its stock would not get Blackstone a good return on its investment. Blackstone learned that in 2018, when it decided to sell 8 million shares of Vivint Solar stock at a 21% discount to the previous day's stock price, sending the price tumbling. If Blackstone wanted to exit its investment, it needed a different way.

28.     An acquisition of Vivint Solar would allow Blackstone to exit its investment without a significant discount. Any transaction, however, would need to be carefully considered to avoid a repeat of the SunEdison deal. In July 2015, Vivint Solar agreed to be acquired by SunEdison for $2.2 billion. But investors were not supportive of the transaction. Vivint Solar's stock price collapsed, falling from a high of $15.86 per share in July 2015 to a low of $2.56 per share in March 2016. SunEdison could not obtain financing for the deal, and Vivint Solar terminated the merger agreement in March 2016.

29.     This time around, Blackstone made sure to take its time. Parties interested in a strategic transaction began contacting Vivint Solar in mid-2018. In 2019, two separate parties made informal proposals to acquire the Company at a discount to the Company's then stock price. Defendant Wallace rejected those proposals on behalf of Vivint Solar. A sales process did not

begin until January 2020. The Merger Agreement was not approved until six months later, on July 6, 2020.

30. Just because the sales process took time does not mean that the Proposed Transaction is the result of a fair process, or even represents a fair price. For example, the S-4 notes that in the second half of 2019, the Board considered and did retain Morgan Stanley and BofA as financial advisors, and members of Vivint Solar management prepared materials for an online data room. Blackstone representatives "participated in the process." While the S-4 is vague, Blackstone appears to have participated in selecting the Company's financial advisors and preparing materials for interested parties to review during the sales process. This is troubling, considering that Morgan Stanley received $206 million in compensation from Blackstone in the two years preceding its fairness opinion, while BofA received $1 billion in compensation from Blackstone from June 1, 2018 through May 31, 2020.

31. Blackstone played a key role in steering the sales process and negotiating the terms of the Merger Agreement. On March 9, 2020, the Board decided to create a strategic transactions committee. That committee, established on March 15, 2020, had the authority to evaluate proposals and negotiate the terms of any agreement. The members of the strategic transactions committee were all tied to Blackstone: defendant Wallace is a senior managing director at Blackstone; defendant D'Alessandro has a history of sitting with defendant Wallace on the Boards of Blackstone-owned companies, including as Chairman of the Board of Directors of Vivint Smart Home, in which Blackstone holds more than 60%, and as a director of SeaWorld Entertainment, Inc. from 2010 to 2017, in which Blackstone was a significant investor. Defendant D'Alessandro also serves as a director of APX Group Holdings, Inc., which is a subsidiary of Vivint Smart Home. It was the strategic transactions committee that asked management to update financial forecasts in

April 2020. The strategic transactions committee discussed how the Proposed Transaction might impact Blackstone, specifically whether Blackstone would be required to agree to transfer restrictions on the Sunrun stock it would receive in the Proposed Transaction. Defendant Wallace had conversations with Sunrun representatives that included discussions about both transfer restrictions on Blackstone and the exchange ratio.

32. Finally, the fairness opinions provided by Morgan Stanley and BofA, both conflicted by their relationships with Blackstone, are confusing, opaque and therefore misleading. One example: Vivint Solar's EBITDA is the largest element of Morgan Stanley's discounted cash flow analysis, yet Morgan Stanley did not examine or analyze EBITDA multiples. And Morgan Stanley selected terminal EBITDA multiples based on publicly traded companies that it deemed similar to Vivint Solar for its discounted cash flow analysis, but were not sufficiently comparable to be used in the *Trading Comparables Analysis*.

### B. The Materially Incomplete and Misleading S-4

33. The Individual Defendants must disclose all material information regarding the Proposed Transaction to Vivint Solar's stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

34. On August 14, 2020, defendants filed the S-4 with the SEC. The purpose of the S-4 is, *inter alia*, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff. Without such information, Plaintiff cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

***Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts***

35. The S-4 discloses management-prepared financial projections for the Company, which are materially misleading. The S-4 indicates that in connection with the rendering of Morgan Stanley's fairness opinion, Morgan Stanley reviewed "certain financial projections prepared by the managements of Vivint Solar and Sunrun." In rendering its fairness opinion, BofA reviewed "certain internal financial and operating information with respect to the business, operations and prospects of Vivint Solar furnished to or discussed with [BofA] by the management of Vivint Solar." Accordingly, the S-4 should have, but failed to, provide certain information in the projections that Vivint Solar's management provided to the Board, Morgan Stanley, and BofA.

36. Notably, defendants failed to disclose any kind of reconciliation between projected EBITDA and levered free cash flow. This makes it impossible to assess the materiality of the influence of these amounts compared to results that might have been derived under an unlevered discounted cash flow model. The S-4 specifically fails to disclose projections of both pre-tax levered free cash flows and after-tax levered free cash flows, and the tax rate assumptions that account for the difference between pre-tax levered free cash flows and after-tax levered free cash flows. The S-4 further fails to disclose a reconciliation of EBITDA to both pre-tax levered free cash flows and after-tax levered free cash flows. In addition, the S-4 fails to disclose all of the cash flows (through 2049) used in BofA's discounted cash flow analysis. Furthermore, the S-4 fails to disclose 2025 EBITDA, which was used by Morgan Stanley in the terminal value of its discounted cash flow analysis. Finally, the S-4 fails to disclose whether either measure of cash flow was calculated by Morgan Stanley or BofA instead of the Company and, if so, the assumptions used by Morgan Stanley and/or BofA to calculate the projections. This omitted information is necessary for Plaintiff to make an informed decision on whether to vote in favor of the Proposed Transaction.

***Materially Incomplete and Misleading Disclosures Concerning Morgan Stanley's and BofA's Financial Analyses***

37.   Neither Morgan Stanley nor BofA examined or disclosed EBITDA multiples in their *Trading Comparables Analysis* or *Selected Publicly Traded Companies Analysis*, respectively. EBITDA multiples are a staple of valuation analyses and fairness opinions. They play a central role in the overwhelming majority of fairness opinions prepared for mergers involving publicly traded companies. The S-4's failure to disclose the analysis of EBITDA multiples in Morgan Stanley's and BofA's respective public company analysis is especially egregious given that the financial forecasts include EBITDA and the terminal value in Morgan Stanley's discounted cash flow analysis was based on EBITDA multiples. In fact, EBITDA multiples formed the basis for the largest element of the most important valuation analysis (the discounted cash flow analysis) conducted by Morgan Stanley. Yet, the S-4 fails to disclose the EBITDA multiples observed by Morgan Stanley for the companies used to derive terminal value multiples for the discounted cash flow analysis.

38.   Discounted cash flow models in fairness opinions are nearly always prepared on an unlevered basis. The use of levered models is highly irregular. Levered discounted cash flow models are subject to distortive influences from the timing of borrowings and repayments of debt, which influences the timing of levered cash flows for reasons unrelated to the operational cash flows of the business. These timing differences have a significant influence on indicated present values under the discounted cash flow approach. The S-4 fails to disclose the reasons that the financial projections for Vivint Solar, as included in the S-4, show changes in projected levered free cash flow that are much larger than changes in the projected EBITDA. Generally, barring unusual circumstances, the reverse is true. The S-4 fails to disclose whether borrowings, debt repayments and interest expenses are the only differences between EBITDA and levered free cash

flows.

39. There are significant irregularities related to the use of a pre-tax discounted cash flow model by Morgan Stanley, compared to after-tax discounted cash flow models that are used in most instances, including by BofA. First, a pre-tax model is not the appropriate means of valuing taxable corporations such as Vivint Solar. Second, Morgan Stanley's discounted cash flow results should be higher than BofA's results, as tax expense isn't deducted from the pre-tax levered free cash flows used in the model. This should reflect higher cash flows. Tax expense is deducted from the after-tax levered free cash flows used by BofA, which should reflect lower cash flows. The S-4 does not disclose the basis for Morgan Stanley's discounted cash flow results being lower than BofA's results, as the differences in the ranges of discount rates selected by each of Morgan Stanley and BofA are not large enough to account for the difference in results. Finally, the S-4 fails to disclose whether the "Vivint Solar Levered Free Cash Flow" figures on page 133 of the S-4 reflect pre-tax or after-tax levered free cash flows.

*Materially Incomplete and Misleading Disclosures Concerning the Flawed Process*

40. The S-4 also fails to disclose material information concerning the sales process. For example, at a number of Board meetings there was an executive session. However, the S-4 fails to disclose who attended these executive sessions, specifically for the Board meetings held on September 19, 2018, January 17, 2019, June 27, 2019, January 23, 2020, and June 10, 2020.

41. The S-4 notes that Party C and defendant Wallace had discussions in spring of 2019 about a potential transaction. A confidentiality agreement was executed with Party C on May 9, 2019. The S-4 does not disclose when conversations took place between Party C and defendant Wallace, when defendant Wallace informed other members of the Board of his conversations with Party C, and which members of the Board were informed.

42. Also during the spring of 2019, a member of the Company's management was contacted by Party D, and a member of Vivint Solar's management met with Party D. The S-4 does not disclose the identity of these members of management. Similarly, a member of the Company's management contacted Party F to discuss a potential transaction. The S-4 does not disclose which member of management initiated contact with Party F and whether the Board was aware of and authorized such contact.

43. On June 27, 2019, members of the Board and management met and discussed interest in a strategic transaction with Morgan Stanley, BofA, and another investment bank. The S-4 does not disclose which members of the Board were part of the discussions. Similarly, members of management and the Board discussed a sales process with Morgan Stanley and BofA throughout the second half of 2019. The S-4 does not disclose which members of the Board were part of those discussions.

44. The sales process began in early 2020. There were 24 parties contacted, including Sunrun and Party C. The S-4 does not disclose whether the parties that had contacted defendant Bywater, as he discussed with the Board on June 27, 2019, were contacted during the sales process.

45. Throughout January and February 2020, financial forecasts were shared with potential bidders. Sunrun received financial forecasts that excluded certain information. The S-4 does not disclose whether other parties received similar forecasts and, if not, the basis for providing Sunrun with a different set of forecasts from the other parties.

46. On April 15, 2020, the Board held a meeting that mainly focused on ordinary business. However, Morgan Stanley provided an update on the sales process. The S-4 does not disclose what kind of update was being provided and whether any financial analyses were discussed at that meeting.

47.     The strategic transactions committee held a meeting on April 28, 2020 with other members of the Board.  The S-4 does not disclose the identity of those other Board members who attended the meeting.  The S-4 also does not disclose the preliminary financial analyses reviewed at that meeting.

48.     To induce an increased bid from Party C, Vivint Solar agreed to pay $3.75 million to cover some of Party C's expenses if the Company entered into a merger agreement with a different party.  The S-4 does not disclose whether that amount has been paid to Party C, or whether conditions were met to make the fee not payable.

49.     On May 21, 2020, defendants Wallace and McEvoy discussed a regulatory termination fee with a representative of Sunrun.  The S-4 does not disclose whether the discussions were made on behalf of Blackstone or the Company.  Similarly, on June 15, 2020, defendants Bywater, Tibbetts, Wallace and McEvoy discussed terms of the merger agreement with representatives of Sunrun.  The S-4 does not disclose the basis for those specific directors being involved in the discussions, or whether defendants Wallace and McEvoy spoke for Blackstone or Vivint Solar.

50.     The S-4 fails to disclose the preliminary financial analyses related to Vivint Solar, Sunrun and the Proposed Transaction as reviewed with the Board on July 2, 2020.  Similarly, the S-4 fails to disclose the preliminary financial analyses related to Vivint Solar and Sunrun on a standalone basis, as well as the combined company and the exchange ratio.

51.     Finally, the S-4 indicates that BofA received $1 billion in compensation from Blackstone from June 1, 2018 through May 31, 2020.  The S-4 does not disclose whether BofA received compensation from Blackstone between June 1, 2020 and July 6, 2020, the date of their fairness opinion, and if so how much compensation was received.

52.     This information is necessary to provide Plaintiff a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.  Without all material information, Plaintiff is unable to make a fully informed decision in connection with the Proposed Transaction and faces irreparable harm, warranting the injunctive relief sought herein.

53.     In addition, the Individual Defendants knew or recklessly disregarded that the S-4 omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

54.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the S-4 before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so.  The Individual Defendants thus knew or recklessly disregarded that the S-4 omits the material information referenced above and contains the incomplete and misleading information referenced above.

55.     Further, the S-4 indicates that on July 6, 2020, Morgan Stanley and BofA reviewed with the Board their financial analyses of the Merger Consideration and delivered to the Board oral opinions, which were confirmed by delivery of written opinions of the same date, to the effect that the Merger Consideration was fair, from a financial point of view, to Vivint Solar stockholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning Morgan Stanley's and BofA's financial analyses which has been omitted from the S-4, and thus knew or should have known that such information has been omitted.

56.     Plaintiff is immediately threatened by the wrongs complained of herein, and lacks an adequate remedy at law.  Accordingly, Plaintiff seeks injunctive and other equitable relief to

prevent the irreparable injury that Plaintiff will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9**

57.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

58.     Defendants have filed the S-4 with the SEC with the intention of soliciting Vivint Solar stockholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the S-4, which fails to provide the material information referenced above.

59.     In so doing, defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Vivint Solar, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

60.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with stockholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

61.     Specifically, and as detailed above, the S-4 violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of Vivint Solar shares and the financial analyses performed by Morgan Stanley and BofA in

16

support of their fairness opinions; and (iii) the sales process.

62. Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the S-4 is materially misleading and omits material information that is necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the S-4 states that Morgan Stanley and BofA reviewed and discussed their financial analyses with the Board during various meetings including on July 6, 2020, and further states that the Board relied upon those financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading.

63. The misrepresentations and omissions in the S-4 are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

64. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65. The Individual Defendants acted as controlling persons of Vivint Solar within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Vivint Solar and participation in and/or awareness of the Company's

operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

66. Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to the time the S-4 was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

67. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the S-4.

68. In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

69. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

70. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and against the defendants jointly and severally, as follows:

A. Preliminarily and permanently enjoining defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing an amendment to the S-4 with the SEC or otherwise disseminating an amendment to the S-4 to Vivint Solar stockholders unless and until defendants agree to include the material information identified above in any such amendment;

B. Preliminarily and permanently enjoining defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until defendants disclose the material information identified above which has been omitted from the S-4;

C. In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff rescissory damages;

D. Directing the defendants to account to Plaintiff for all damages suffered as a result of their wrongdoing;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 25, 2020        **RIGRODSKY & LONG, P.A.**

By: */s/ Gina M. Serra*
       Brian D. Long (#4347)

**OF COUNSEL:**        Gina M. Serra (#5387)
       300 Delaware Avenue, Suite 210
**ROWLEY LAW PLLC**        Wilmington, DE 19801
Shane T. Rowley        Telephone: (302) 295-5310
Danielle Rowland Lindahl        Facsimile: (302) 654-7530
50 Main Street, Suite 1000        Email: bdl@rl-legal.com
White Plains, NY 10606        Email: gms@rl-legal.com
Telephone: (914) 400-1920
Facsimile: (914) 301-3514        *Attorneys for Plaintiff*